MEMORANDUM OF DECISION
On June 1, 1999, the Department of Children and Families, hereafter "DCF," filed petitions for the termination of the parental rights of Linda S. to her three children. DCF also filed termination petitions against the respective biological fathers of these children; William R., Jr., the father of the two oldest children, William R., III and Daniel S., and Raymond B., the father of the youngest child, Raymond B., Jr. Both Linda S. and Raymond B. filed motions for revocation of the commitment of the children, which motions were consolidated with the termination petitions for trial.
The trial was held over many days, beginning on January 24, 1999. It was continued on January 26, 27 and February 8, 9, 10, 23 and ended on February 25, 2000. After the conclusion of the petitioner's case, the respondents made oral motions to dismiss the petitions for the state's failure to establish a prima facie case, decision on which was deferred to the completion of the trial. Linda S. and Raymond B. attended the trial, but William R. failed to attend until the last two days of trial. No explanation was given for his earlier CT Page 5100 absence. His counsel vigorously represented his interests.
For the reasons stated below, the court denies the motions for revocation of commitment. The court grants the motions to dismiss the termination petitions on the grounds of abandonment of these children by Linda S. and Raymond B. and their children. Connecticut General Statutes § 17a-112 (c)(3)(A). The court further dismisses the petitions as to these parents on the ground of no ongoing parent-child relationship, not pursuant to the motions to dismiss, but because the evidence does not meet the statutory standard of "clear and convincing" evidence. However, the court grants the petitions for termination of the parental rights of Linda S. and Raymond B. to Daniel S. and Raymond B., Jr. because of their failure to rehabilitate themselves as parents of these children. As to William R., the court finds all grounds proven by clear and convincing evidence, that he has abandoned them, that there is no ongoing parent-child relationship with his sons and that he, too, has failed to rehabilitate himself as a parent. Connecticut General Statutes § 17a-112 (c)(3)(A), (B) and (D). Because of the court's best interest findings, the court dismisses the petition as to the child, William R., III. From the evidence presented, the court finds the following facts:
 A. FACTS 1. Investigation and Placement of the Children, 1996.
On June 17, 1996, DCF received an anonymous referral concerning Linda S. and her boyfriend, Raymond B. The referral source indicated that the family was spending money for drugs and that the children were dirty and hungry. The next day an investigations worker went to the apartment in which Linda and her family lived. She discovered that there was no power on, the house was messy and there was little food in the house. Linda confessed that she owed money to the power company. She also stated that she was about to be evicted as she was four months in arrears on her rent. After further discussion, she confessed that she used drugs. The worker testified that she stated she "needed to use heroin in the morning to be able to function during the day." When the boyfriend, Ray B., Jr. returned to the house, he, too, confessed to using heroin daily. He described that one of them would leave in the morning to buy drugs and then return to the apartment when they would take turns shooting up in the bathroom. The investigation report notes that "they said they needed to use it because if they don't do it, they are not able to get out of bed and they get sick."[2]
CT Page 5101
That day, DCF determined that there was no immediate danger to the children, entered into a service agreement with Linda S. and Raymond B., and referred them for a substance abuse evaluation and treatment. The service agreement required the parents to attend the evaluations, attend treatment if recommended, to cooperate with DCF and to maintain a secure home for the children.
On the date of her investigation, the worker noted that William, the oldest, was then twelve years old. Linda, his mother, she stated, had a difficult time handling him. At one point, he took off all his clothes and started to masturbate in front of them. Linda was unable to stop this behavior. The worker reported that William had special needs and was autistic. He was then attending a program for children with autistic problems. She found that Daniel, then six years old, was very shy and quiet. Raymond B., III, then three, she noted was an active child. Although the investigations worker, who testified at trial, determined there were not enough facts to warrant immediate removal of the children, she found that all the children were at risk because of the drug use in the family and substantiated the neglect allegations.
Prior to referring the case further, the investigation worker spoke to the father of the two oldest children, William B., Jr. He wanted to know if the children had been removed from Linda and informed her on June 19, 1996 that he could not be a resource for Bill, the oldest. William B. has maintained this position with various variations for both of his biological children to the conclusion of the trial. His plan for them is that they be returned to Linda. The court concludes from this that he is not now able or willing to become the custodial caretaker for either Billy or Daniel.
While the respondent parents and their counsel have tried to minimize the condition of the family at the time of their contact with DCF in 1996, the facts reveal a family whose life together was spiraling out of control. The drug use the parents would later admit in various evaluations and the financial jeopardy they were in reflects two adults who were spending much of their limited income on drugs over other pressing needs for housing, utilities and food. This was a family with an autistic eldest child, who was not regularly attending the specialized school his mother had found for him. The clear and convincing evidence also supports the conclusion that Linda S. nor Raymond B., Jr., by virtue of their constant daily drug use, were not emotionally available for any of the three children at that time and had not been emotionally available to them for some time.
In July, 1996, Linda S. was arrested and jailed. Raymond B. was CT Page 5102 left alone with the three children. He brought them to Linda's sister, who, after keeping them for a few days, brought them to the police as she stated she was unable to care for them. This relative had previously stated she was unwilling to care for the children when asked by the investigations worker prior to the removal of the children. After this, Raymond B. agreed to voluntarily place Raymond B., Jr. with DCF, as he did not feel he could care for any of the children alone.
On July 26, 1996, an order of temporary custody was granted. On October 24, 1996 all three children were adjudicated as homeless children.[3] Their commitment to the Department of Children and Families has been extended three times since that date.
2. Linda S. the mother.
Linda is now thirty-four years old. She is one of four children and by all accounts she had a difficult childhood. She has reported that her father was an alcoholic and emotionally abusive. As an adolescent, her conflict with her family increased and she spent time in a group home. It was during this time that she met William R., Jr., the father of her two oldest children, with whom she had a ten-year relationship. After this relationship ended, she developed a relationship with Raymond B., who was the superintendent of the building in which she resided. It was after her relationship with Ray B. began that Linda began to use crack cocaine and heroin. Linda, by the reports she made to various drug treatment evaluators, has been using marihuana and beer since she was fourteen and heroin and cocaine since she was twenty-five years old.
Her arrest record reflects that she was first arrested for possession of narcotics on November 29, 1993, when she was twenty-eight years old. She was incarcerated for the offense. She was arrested in each year from 1993 through 1996 for similar offenses and was incarcerated for six months in 1994, and again in September, 1996 for ninety days. It was during the 1996 incarceration that her children were removed from her. This record demonstrates that by 1996 Linda's substance abuse problem was severe and she had begun to suffer the criminal consequences for that illegal drug use. Despite this, the records of Linda's substance abuse treatment reflect that, throughout the three years of treatment following 1996 prior to the filing of the termination petitions, she minimized the seriousness of her addiction. She also did so when she testified at trial.
There was much testimony about the various programs Linda attended between the time the children were committed to DCF and the filing of CT Page 5103 the termination petitions. What is clear is that her course of progress was like that of most addicted individuals: with a few steps forward, relapses and commencement of attempts to maintain sobriety yet once again.[4] Her addiction has caused enormous difficulty in her life; involvement in the criminal justice system as well as her ongoing inability and unavailability to care for her children. But most compelling was her own testimony on the last day of trial, when she gave her testimony with regard to her attempts to rehabilitate. "I always did it because I was told to and I never really had a willingness until today."
Linda S. testified that she has been sober since April 21, 1999, just one year ago. Earlier on March 30, 1999, she was arrested for larceny in the sixth degree. She spent forty-five days incarcerated commencing on May 3, 1999.[5] Following her incarceration she sought out and secured placement in a residential drug treatment program in July, 1999. It is not known when she will leave the program, but her maximum time of stay can not be longer than two years. The twelve months she has been sober reflects the longest period that she had been drug-free in several years, and her ability to remain sober when in the community without the structure of the program is as yet untested.
A counselor from Project Courage testified about Linda's stay there. She stated that she met Linda when Linda was admitted to the most intensive level of care in the program in July, 1999. Linda progressed to the next lower of level of care on October 25, 1999. She stated that Linda S. had met her treatment goals within the program which include "abstinence from all mood-altering drugs and require her to gain factual information about addiction to identify and recognize the triggers for relapse and set-ups. Linda has begun," she noted, "to build a more positive self-image." The counselor knew that Linda's drugs of choice were heroin and crack-cocaine.
Another counselor also testified as to her meetings with Linda in the residential program. She stated that Linda is "the hardest working resident — she goes the extra mile to make sure she does what is asked of her." Also part of the program is for Linda to attend twelve-step programs, which she has been doing. She clearly has struggled with the issues of drug use and has done well in this treatment facility. She is to be congratulated for her efforts to overcome her addiction.
(a) Visitation and Linda's relationship with the three children.
Linda has visited with all of her children throughout the pendency CT Page 5104 of this case and they each appear to understand that she is their biological mother.[6] While there were times when Linda was actively using drugs that her visits were erratic, the court cannot conclude from the records of the visitation that she has failed to visit adequately most of the time. What is at issue in this case and highlighted by the testimony of the witnesses is the quality and the nature of the parent-child relationships.
The court heard testimony from two individuals employed by Boys Village, who provided intensive in home services to the parents from March 20, 1999 to May 20, 1999, when the services were terminated. The team's clinician had responsibility for counseling the parents. She stated that the program had four goals: (1) to provide drug and alcohol education to the parents, (2) deal with issues of domestic violence in the home, (3) the relationship of the children with their parents and (4) the transition issues for reunification.
Prior to ending the in-home services, the clinician noted there were considerable difficulties. She found that Raymond B. was not able to effectively interact with his child. He acted more like a friend than an adult parent to him. He required coaching and prompting during the supervised visits she observed with the children. While he was attentive and interested, he was not effective. Linda S., she stated was less involved and reserved her interaction mostly for her son, William. Neither parent successfully completed the parent/child component of the program. She noted that William R., Jr. also attended to be with his children. The plan, however, was not reunification of his children with him as he never sought this result.
Many questions asked during trial about a system the Boys Village workers described as the "1, 2, 3 Magic method," a type of graduated time-out discipline system. The individual who did most of the hands-on work with Linda S. and Raymond B noted that Raymond B. was never able to successfully use this technique. Raymond B., despite his sincere efforts, was not able to properly control his son. He was able, he noted, to use the first two parts of the technique, but he was never able to implement the third step, which required the imposition of punishment by way of a time-out for his son. He testified concerning the visits he observed with the children, which were held at Burger King and a local park. It was during those visits that he observed the problems he described.
He met Linda only twice prior to her incarceration and he noted that she was often not available for scheduled program appointments. He testified that she did not make any progress. During this time, as CT Page 5105 would later become apparent by her own testimony, Linda was still actively using illegal drugs, in particular crack-cocaine. She did not then admit that her drug use continued to overwhelm her best intentions. Her continued drug use unfortunately prevented this last chance for reunification from having any possibility of success.
The DCF social worker, Cheryl Paul, also testified concerning these visits as well as later visits after the termination petition was filed on August 1, 1999. She, too, saw a lack of affection between the parents and the children, a lack of being able to set limits and a lack of direction for those children within the artificial constraints imposed by the one hour supervised visits. She testified concerning Ray that he "ignores his mother unless he wants something. He has had tantrums stamping his feet and whining. She [Linda] does not address this behavior. Occasionally, she interacts with him and talks to him while they eat."
Unfortunately for the family's reunification efforts, as noted on May 5, 1999, Linda S. was incarcerated for forty-five days and the team was unable to continue services to her. Subsequently she did admit that she was using drugs during this time until April 24, 1999. Raymond B. was told if he wanted to have individual services for reunification, he should notify his counsel to request such services. He never did so and all reunification efforts were then discontinued.
Dr. Rosado completed a family evaluation in January, 2000. During the interaction session between Linda and the three children, Raymond, Jr. became more and more upset when a card game they were playing did not go his way. "As his ire increased, he became progressively louder and exhibited disrespectful behavior, making derogatory and insulting statements to his mother and also voicing threats." None of the interventions Linda or Ray tried with him worked and he had a tantrum. The court concludes from these observations that Linda had not benefited from the parenting class or the Boys Village program to learn how to effectively confront and end such behaviors in a child who was then almost seven years old.
(b) Psychological Evaluations.
Underscoring the problems, which the Boys Village workers as well as the social worker noticed during the visits in 1999, are the evaluations performed by Rudolfo Rosado, the court appointed psychologist evaluator. He evaluated this family in 1997, 1998 and in 2000. The reports of his evaluations and his testimony in this case provide needed information and assistance to the court. He testified that, given the nature of his assignment by the court, he had not CT Page 5106 considered the issue of termination of parental rights. He could, he noted, neither speak for or against this subject. He also had never assessed the nature of the relationship between the foster father with whom the two youngest children reside nor William's foster mother as he is placed separately from his two siblings, in view of his extraordinary care needs.
In Dr. Rosado's opinion, he believed that Linda was easily overwhelmed by even moderate stresses. He noted that she required a support system and that her primary support was Raymond B. He noted in his written report that:
 "Ms. S. is intelligent, and in her relationships she is a sensitive person who has a considerable capacity for affection. Unfortunately Ms. S. struggles with formidable weaknesses. She has a negative self-perception that is not consistent with her actual capabilities. When faced with challenges her anticipation of potential failure undermines her ability to do well, and her nervousness causes her to actualize these fears. In addition, she struggles with internal psychological conflicts, which cause her to be depressed and impair the quality of her interpersonal functioning."[7]
Dr. Rosado went on to report that the Linda S. did not have an integrated personality structure. He noted that there are two dominant aspects of her self that are in constant conflict. He viewed those two conflicting aspects as follows:
 "First, Ms. S.'s self-image causes her to believe that she is incapable. She does not trust her own perception, and seeks others to provide guidance and direction. This creates situations where Ms. S becomes involved in dependent relationships, relying on another to take charge of her life. In these relationships, Ms. S. really wants to be loved, protected and nurtured. Instead, she eventually comes to believe that she is controlled, dominated and subjected to the will of another. . . .
 There is another aspect to her persona. Ms. S.'s innate capabilities often allow her to have perceptions and understandings that are clear and insightful. A weaker, yet more capable part of her self conflicts with her usual low self image, struggling to assert itself and find outward expression.[8]
CT Page 5107
Dr. Rosado observed that when the incompatible aspects of Linda's personality conflict, she feels confused and is internally in great distress. He concluded that it was not surprising that she turned to alcohol and marihuana to soothe her irritability and internal confusion. That same mechanism, the court concludes, also led her to use heroin and crack-cocaine regularly.
Dr. Rosado believed that, given Linda's past history, she would need an additional two years of sobriety, measured from the date of his testimony in January, 2000, before the children could safely be reintroduced into her life and plans made to return them to her. When questioned about Linda's ability to remain sober in the future, he testified:
 "in looking at people, one needs to appreciate that there are feelings, behavior and cognition. Psychological health is when all three things work well together. It is possible for people to feel strongly and not be able to act. The question has to do with [Linda's] behavior. Her actions are what she actually does and have less to do with her intent and her feelings. ... a few months of sobriety are insufficient.(emphasis added). There has to be a demonstration of behavioral change that is longer because the pattern [of substance abuse] has existed in the past 20 years."
He stated that his concern for Linda is the relationship between what she actually did and what she felt. When asked about whether Linda had reached "bottom" as often referred to in the 12 step programs, he stated "I do not know that she had absolutely reached bottom." He testified further that "when one is addicted, that takes away these feelings over time until the drugs become the main focus. This would start slowly and then the drug become the primary force." The court concludes, from all of the testimony, that this was the case for Linda S. Even in the spring of 1999, after three years of efforts, she had not been able to even begin to address the pattern of substance abuse, which in some form was of over twenty years standing. While it is gratifying to know that she attended many AA and NA meetings in the years between 1996 and 1999,[9] this evidence only serves to point out the difficulties suggested in the testimony of the psychologist. She was unable to secure an adequate support system to remain sober. When the inevitable relapse came, she had no reasonable method by which to deal with it and the impact it would have yet once again on her children, were they in her care.
(c) Services offered Linda S. CT Page 5108
The court finds, from the voluminous exhibits and by the clear and convincing evidence, that Linda S. was referred to many services, whether by the criminal justice system as required as part of the terms of her probation after her several releases from incarceration, by DCF, by other programs or by herself. Those programs included Guenster Rehabilitation Center for drug screening and treatment in 1996 and 1997, Advanced Behavioral Health for substance abuse issues in 1997, 1998 and 1999 and Project Courage for inpatient substance abuse treatment, counseling and vocational training. Linda was referred for a psychological evaluation and an evaluation of her interaction with her children. There was, as reviewed above, the Boys Village Intensive reunification program well as supervised visitation and ongoing case management services. Linda completed a parenting program, attended an "alternative to incarceration" (AIC) program several times which provided group counseling sessions regarding substance abuse. She attended many AA and NA sessions as part of her efforts to remain sober. The court finds, from the clear and convincing evidence, that the services offered were more than reasonable to address her issues of substance abuse and parenting. The court concludes from that evidence that DCF made reasonable efforts to reunify Linda with her three children.
3. Raymond B., the father of Raymond B., Jr.
Raymond B., the father of Raymond B, Jr., is now forty-eight years old. He completed high school and was employed for over eighteen years as a turbine operator in a power plant. In late 1996, he was diagnosed as having a tumor on his kidney. One of his kidneys was removed and the other has ceased to function. He receives kidney dialysis three days a week and is receiving social security disability income. In the summer of 1996, he admitted to heroin use. He used heroin regularly, he admitted, for fourteen years from the time he was thirty until he had his kidney removed in December, 1996. There is no evidence of illegal drug use since the removal of his kidney, although Linda S. told the social worker Cheryl Paul in 1999 that he has been using heroin for a long time. Mr. Barbour testified at trial and maintains that such use would be life threatening. Further, the laboratory, which tests his blood after dialysis, does not screen for such drugs. The court concludes that there is insufficient evidence for the court to conclude that Ray Barbour has used illegal drugs since December, 1996.
(a) Psychological Evaluations.
Raymond B. was also evaluated by Dr. Rosado. Dr. Rosado found Mr. B. to be a "caring and committed parent, who was frank and CT Page 5109 forthright. . . . He has significant strengths." Dr. Rosado noted that there were no indications of "significant psychopathology."[10]
However, in the family evaluation in December, 1998, he noted that Raymond B. and Ms. S. related well to the children, but:
 "that was little interaction or collaboration between the two adults . . . . they never seemed to work together as a couple . . . . Ms. S. and Mr. B. maintained an unusual degree of separateness with each other, which was especially striking in contrast to their close and affectionate manner with the children."[11]
Dr. Rosado recommended couples counseling for Mr. B. and Ms. S, which was never begun, perhaps as a direct consequence of Linda's continuing drug abuse and following legal difficulties.
In the family evaluation conducted in January 2000, Dr. Rosado had concern for Mr. B.'s functioning. He noted that he believed there was an underlying depression, perhaps occasioned by the traumatic and early losses Mr. B. had experienced while a child, first the loss of his father and then because of his mother's lack of attention, due to her depression and alcoholism. He noted that "Mr. B. has a tendency to become intensely attached in relationships and is willing to tolerate any stress and hardship, rather than to face the tortuous feelings associated with another separation and loss." He also noted that "his overwhelming desires [for a positive family life] have colored his perception in a way that causes him to overlook potential problems and impair his judgment."[12] In his testimony he noted that Mr. B. "instead of dealing with [problems] directly, he tries to make things nice." When questioned about his ability to become a meaningful parent, Dr. Rosado stated "in terms of actively being a parent, I do not know how much time he was primarily responsible for the care of the children." He then made reference to the 1996 incident when Mr. B. was left to care for the children by himself.
Dr. Rosado related in his family evaluation and in his testimony a tantrum that Raymond had when his father came into the room. Raymond Jr. demanded to know why there was no snack and then had a tantrum about his father's failure to provide one. His father left and went to get some snacks. What was remarkable, Dr. Rosado noted, "[Raymond, Jr.] was fine the minute his father left the room. There was a manipulative quality to what he did . . . the attachment was insecure." He noted that Raymond B. was not successful at calming Ray, Jr. When asked if he knew that this form of interaction were repeated during other visitation sessions, Dr. Rosado replied that "I would be concerned about that type of dynamic occurring in the home. CT Page 5110 He noted that "the fact that [Raymond, Jr.] expected a snack or gift instead of appreciating parental attention and also had displays of disrespectful behavior was problematic."
Dr. Rosado was not aware that the family had been referred to the Boys Village for reunification services. When asked about his recommendations, he mentioned both in his testimony and in his most recent evaluation that it might be helpful for a family therapist to work with the parents and the children to see if their relationship could be improved. He stated that in his opinion, such a therapist would be able to gauge in a relatively short time — say four to six weeks — whether this strategy would be successful or not. He also repeated that he did not complete any of his evaluations from the point of view of termination. Consequently although his recommendations were for continued reunification efforts first in the 1998 family evaluation and in the 2000 evaluation, the court discounts them, as he did himself. Dr. Rosado stated that he made the assumption that DCF was continuing with their reunification efforts, as he had not been informed otherwise. He noted: "I never received a summary of the facts for the termination of parental rights."
The court further concludes that, despite the respondents' claims to the contrary, the parents and the children were given the type of therapeutic parent-child intervention to which Dr. Rosado refers. The Boys Village program was designed to assist the parents with a total of four goals, including the parent-child relationship, and to facilitate reunification. Unfortunately for Linda S. and Raymond B., they were both unsuccessful in utilizing the services of the program to aid in their reunification efforts. Mr. B., the court finds, did not take action when the program ended because Linda S. was incarcerated and because DCF was filing for termination of parental rights, to seek these services for himself. The court credits the testimony that such services would have been made available to him, had he sought them out. The court concludes from this and his own testimony in court that Raymond B. does not view himself as the primary caretaker for his son. He sees his role as secondary to that of Linda S. and believes that, when she is released from her inpatient drug rehabilitation program, they will again be able to live together as a family. His present plan is to have all three children with him until she is able to resume her full parenting role. He remains committed to their relationship, as does Linda S.
(b) Services offered Raymond B., the father of Raymond B., Jr.
The court notes that Raymond B. was dedicated in visiting all the children without fail, although at times he seemed to have a clear CT Page 5111 preference for seeking out and interacting with his own son. He has met many of the expectations set for him during the pendency of the proceedings. However, the court concludes that he does not presently possess the skills to adequately parent Raymond Jr. He has received referrals for substance abuse assessment and for parenting classes. He has received visitation, visitation assistance, case management services as well as the referral for intensive reunification services with the Boys Village program.
4. William R., Jr.
William R., Jr. is now thirty-nine years of age and is the father of William, III and Daniel R. As noted, he and Linda S. met when they were both adolescents involved in a group home. He did not graduate from high school and is marginally employed as a house painter. He has not had reliable housing and does not offer himself as a caretaker for his children. He has not functioned as a parent in the household interacting with his children daily for many years. While he has attended many visits with the children, especially in the recent past, he does not appear to relate to his sons as a functioning parent would. He has not inquired about the children's progress with DCF and has not sent either cards or gifts to them. No expectations were ever set from Mr. R., and no specific services were therefor offered to him after the commencement of these actions. He was referred in the beginning of DCF's involvement with this family for housing assistance, which he did not pursue. He also received visitation and case management services.
5. The children, William R., III, Daniel R. and Raymond B., Jr.
(a) William R., III.
William, known as Billy, is sixteen years old and suffers from infantile autism, "the most severe disability that can impact a child for his whole life," Dr. Rosado testified. "[It has] a profound impact on the family. This is a child who is not particularly involved in interactions with other people. He did not have the interest or the capacity to engage in activities as others would." William was diagnosed with autism when he was three and his behavior and general level of functioning continue to be consistent with that diagnosis. He cannot independently care for himself or perform personal hygiene tasks. He cannot speak although he does communicate by some signing and by the use of picture books, his foster mother testified. He is generally well behaved, although withdrawn.
Billy has been in a special education setting at a school with CT Page 5112 other autistic children. At this school, he receives "comprehensive services addressing adaptive skills, prevocational areas and interpersonal needs."[13] The records from the school document the many efforts made to assist this child with minimal functioning. Billy's foster mother testified that she had worked with Billy at the school prior to his removal from his mother in 1996. She knew Billy from working in his classroom in 1992 when he was first placed at the school. She is a teacher's assistant at the school for children with special needs, including autistic children. She noted that while he was in his mother's care, he missed many days at school and in the 1995-1996 school year he was absent a total of 54 days and present 128 days. The previous three years attendance record was approximately the same as the last year he was in his mother's care. Since he has been in foster care, he has only missed school due to illness. He was absent one week in 1999 when he was hospitalized and recently for two days when he had the flu. Otherwise he has had a perfect attendance record.
While several reports indicate that Billy is not toilet trained, this is not the case. He has an intestinal problem not related to his autism that requires attention. Most of the time, he is able to function well. However, in 1999, he had a problem and was in the hospital five days in January 1999 as he was dehydrated. The court further finds from other testimony that Linda S. was then informed Billy was in the hospital and did not visit him. However, his foster mother remained with him around the clock.
When Billy was first removed from his mother, he was placed in a shelter. His foster mother learned of this and she volunteered to take him into her household. She reported that at that time Billy was frightened, undernourished and beside himself. He had to be physically restrained three or four times a day so that he would not hurt himself. He tried to attack her during that time. She stated her plan was to keep him only until school started that year. Nonetheless, in the first few weeks Billy was with her family, they worked through the problems he demonstrated. And those few weeks have turned into almost four years. She testified that Billy frequently had nightmares in the beginning and she would stay up and hold him to calm him. She described his typical day presently, stating that they wake him up at 6:30 and help with his toileting. They help him take a shower. He is then able to get his own breakfast with assistance. He can feed himself. He requires assistance with dressing. "If you hand him an item then he does this — I hand him his socks and pants and he puts them on," she testified. He then goes to school, to a babysitter and then she picks him up around 4 p.m. CT Page 5113
She noted that when he first came he used hand mannerisms, referred to as "flapping," and he also engaged in other self-stimulatory behaviors. He does not do this anymore unless he is upset, his foster mother notes. "He is able through hand gestures to indicate what he needs or wants. And he uses pictures and a little sign language." She reported various trips that she and her family have taken with Billy and how well they have gone. She noted that "difficult moments with him come when Billy gets confused. I try not to put him in situations that confuse him and make him feel unsafe. He needs a lot of structure and consistency."
In her opinion, the visitation with his parents confuses him. "He does not eat or sleep well afterwards and these are signs that he is upset." She noted that it takes him two or three days to calm down, he paces, flaps his hands more and he does not do as well in school. She stated that there was a difficult moment in association with his previous environment.
 "When we first got him, we walked by where he used to live with his parents. He pulled me across the street and was shaking like a leaf. He would not let me go near the house. We were just walking and I did not realize we were near [his old home]."
She reported that visits to the arcade were distressing to him. "The noise is overwhelming and he indicates that he wants to leave." She also notes that when the visits with his parents take place, Billy "flaps a lot and runs around in ways that he is not permitted to do either in her care or when in school." While Billy enjoys eating and candy, she stated she does not encourage this although it is one method of calming him down. "Because of his digestive problems, he is on a strict diet." Further she noted, she "did not need to reinforce him at all because he did not need it at home or at school." She would like to remain the permanent foster parent for Billy as if something should happen to her, she did not wish either her husband or her son to become totally legally responsible for Billy. This, she concluded, might happen if she adopted him. Her plan is to continue to have Billy live with the family until he is twenty-one, when he will be able to live in a group home. It is her plan to retire with her husband at that time.
While children's counsel saw the foster mother's position as a negative one for Billy, the court notes that it is typical, even for autistic children in intact families, to go into state care at this age. The court further notes that caring for many years for a profoundly disabled child, who functions at the level of a two-year CT Page 5114 old pre-verbal child, is both a physically and emotionally exhausting labor of love. Further, the financial costs can be enormous. The implication was also raised that the foster mother was resistant to Linda's involvement with Billy. The court does not find that this was so. The court concludes that she was protective of Billy and that, in view of his evident need for structure and predictable routine, this was not misplaced. The foster mother testified that she had spoken on the phone to Linda when Linda was incarcerated. She stated that she did not think Linda should come to the school during times when she could have casual contact with Billy, as she thought it would be upsetting for Billy. The school principal agreed with this belief.
Concern over this issue arose when Dr. Rosado reported in 1998 that Linda had requested information about autism and autistic children. It was suggested that Linda come to the school to learn more, which she did not do. At his evaluation in 2000, Dr. Rosado noted that she did not appear to have learned more about autism. The foster mother also noted her surprise during the supervised visitations that none of the adults in Billy's family of origin knew that Billy could use rudimentary sign language or a picture book. When he made such signs, they did not respond to him. She also was aware that his mother never attended any school PPT sessions for Billy.
A special education teacher from the school testified. She has Billy in her homeroom at school three times a day. She noted that unless an adult engaged him, Billy would sit by himself and engage in behaviors that were typical of his autistic state. She noted that she tried to engage him as much as possible. She called his hand mannerisms "stemming. Stemming is when he is in his own world. He looks at his hands as he is moving them." She stated that it is the practice to redirect autistic children. In Billy's case, it is to keep him in "our world and encourage him to use communication and focus on the activities at hand." She noted that he needs a:
 "structured environment where people try to engage him in some sort of communication — sign language and picture communication. If people are doing that and taking care of his hygiene and taking care of his needs, that this structured environment is best for him."
During the psychological interaction sessions of Billy with his mother, the evaluator noted a close relationship and that she and Billy are comfortable with each other. Billy smiles when he sees his mother and he is able to tolerate her sitting close to him and touching him. He did report that in the January 2000 session as time went on: "Billy appeared to become increasingly agitated"[14] and CT Page 5115 noted the hand-flapping self stimulatory gestures reported by others. Dr. Rosado observed that that "William remained non-verbal and detached from the family interaction. No one noticed or comment[ed] on his behavior." In conclusion, he stated "William remained mostly uninvolved, yet displaying behavioral indications of discomfort. Other than having candy, there was no evidence that William derived anything positive from the family interaction." He concluded, "unfortunately, there were insufficient indications of a positive parent-child attachment." The court appreciates that it is difficult to understand the subjective state of an autistic child. Nonetheless, in considering Billy's earlier session with the foster mother, Dr. Rosado noted that "he was composed, relaxed and never displayed any self-stimulatory behavior." Contrasting this with his behavior while in the family interactional session, the court concludes that visitation does not provide any discernable benefit to Billy.
(b) Daniel R.
Daniel is the middle child and is now nine years old. He will be ten on June 9 of this year. Dr. Rosado testified concerning both Daniel and Ray that each demonstrated an insecure attachment to their parents. When questioned about the ability of a parent and child to sustain an attachment while only having one hour a week contact, he noted that this "depends on the quality of the relationship that existed first. If there was a strong attachment, then visitation would be a way of sustaining that relationship." He noted that there are two types of insecure attachments; one is having no attachment at all and one is having an ambivalent attachment, which he found with both Daniel and Ray. "An ambivalent attachment demonstrates," he testified, "a desire for closeness, but the relationship that happens is not necessarily positive." He noted that insecure attachments are not considered to be healthy. He testified that Daniel is the "archetypal good boy who is aware of how others are feeling and doing. He does not want to cause any waves. He is a psychologically sensitive and intuitive person." In his most recent evaluation, Dr. Rosado noted that "Daniel presented himself as a compliant but depressed child. His affect was blunted and it was apparent that he was actively restraining and suppressing strong internal emotion and upset." He concluded that Daniel "has difficulty with expressive language skills." It was not apparent to the evaluator whether this was due to the evaluation or whether these were traits, which appeared in other contexts. Dr. Rosado indicated it would be useful to know how Daniel functioned in school and at the foster home. He noted it was clear that Daniel knew that decisions were being made about his permanent placement and he did not wish to speak regarding this issue. The child noted that only his foster father knew and CT Page 5116 understood how he felt.
Dr. Rosado testified that all the children need "stability and permanency and that the lack of these things has the potential to compromise significant areas in their development." He defined permanency as a "stable home with parental figures there to take care of you if you are anxious, sick or hurt — someone you can trust and who will defend you."
Daniel's foster father also testified. He noted that Daniel and Ray had been with his family for almost four years. Daniel calls him "Dad." He reported that Daniel does well in school and there was never a problem with him in school. The foster father stated Daniel was not a problem child even when he first arrived in his new home. "He is a student who reads very well and interacts with other children well." He stated that when Daniel first came, he tried to take care of Ray and that he and his wife took steps to end that. He stated "now, he is a kid, we made him open up and if he needed to say something, say something was bothering him, he would let us know . . . Today, Daniel is able to care for himself instead of everyone else."
He noted that there were problems at times with Daniel's behavior after visits with his biological family. He stated that he was able to control both Daniel and Ray and that they were well behaved in his home. He testified that his wife passed away in late 1998 and that both boys were close to her. Each child has had some grieving to do about this loss. He testified the boys did not receive individual or family therapy to deal with this issue, but that the school had provided some assistance for them.
The foster father testified that he was willing to adopt both boys, even though he is now a single parent. "They were part of my family," he noted. When questioned about Danny, he said "I love him and he is my son." He stated that they enjoyed watching TV, playing around together and going places, like camping. He stated that Danny has a loving relationship with him and his family and that he demonstrates this by his smiles when he wakes up and different things that he does during the day. When questioned, he indicated that he would permit therapy between the boys and their biological parents, if recommended. He went on to state that if he were able to adopt the boys, he would not permit continued contact between the children and the biological parents. This contact is something Dr. Rosado suggested as a way to deal with the many issues that may arise for children who must end their relationship with their biological parents. Dr. Rosado is of the view that children in their circumstances over time, of necessity, have questions about their CT Page 5117 personal identity. As a result, he would recommend that the children be able to address these issues in therapy. He noted that if "children have no access to their biological parents and in the absence of direct information, therapy is more of a struggle."
(c) Ray, Jr.
The court has described in detail some of the difficulties with Ray's behavior while visiting with his parents and in the interactional evaluation sessions. In those settings, he has been prone to tantrums and his parents were unable to control his outbursts. These are not problems that Ray has had in the foster home and in school. His foster father noted that Ray does well in school. There are no reports about out-of-control tantrums at school, he noted and in the home, he controls Ray's behavior by time-outs. Ray's foster father noted that Ray is "a good little kid. I love him very much and we have a lot of fun together." Ray, like Daniel, is in a regular classroom setting and does not require special education services. Ray's foster father stated that Ray does say he loves to visit with his father.[15] Sometimes the child "comes back with a terrible tantrum or everything is chaos. I usually straighten him right out when he comes home. I give him a timeout in his room."
 B. REVOCATION OF COMMITMENT
Both Linda S. and Raymond B. have filed motions to revoke the commitment of their children to DCF. With regard to revocation of such commitments, Connecticut General Statutes § 46b-129 (m) provides that:
 "Any court by which a child . . . . has been committed pursuant to the provisions of the section, may, upon the application of a parent . . . . upon finding that cause for commitment no longer exists, revoke such commitment . . .".
Our case law has clearly held that:
 "The burden is clearly upon the persons applying for the revocation of commitment to allege and prove that the cause for commitment no longer exists. Once that has been established, the inquiry becomes whether a continuation of the commitment will nevertheless serve the child's best interests."(Internal citations and quotations marks omitted.) In re Cesar G., 56 Conn. App. 289, 292, 293
___ A.2d. ___ (2000).
The In re Cesar C. court noted at page 294 that: CT Page 5118
 "The court, in determining whether cause for commitment no longer exits, would obviously look to the original cause to see whether the conduct or circumstances that resulted in commitment continue to exist . . . The trial court, thereafter, "may consider if any cause for commitment still exists."
Applying the law to this case, the court concludes that for Linda S. the original cause for commitment still exists. While she has maintained her sobriety in an institutional setting and is permitted brief time outside such a setting, her sobriety is as yet untested within the unstructured and uncontrolled world in which she will find herself at the conclusion of her inpatient substance abuse program. At this time, the court cannot conclude that the cause for commitment no longer exists, when the evaluator testified persuasively that it would be another two years before such an assessment could be made.
In considering the circumstances of Raymond B., the court cannot conclude that the original cause for the commitment continues to exist in view of his medical problems and the lack of evidence as to any present drug use. Nonetheless, the law permits the court to consider whether or not any cause for the continued commitment exists and the court does so conclude. It is apparent that Ray is unable to parent his son and to have an appropriate parent-child relationship with him. He cannot control his son's behavior and provide the structure and consistency this child needs. It is also not apparent to the court, given Ray's testimony and statements, that he is prepared to parent his son on his own. Given the court's conclusion as to Linda S., this remains an issue of grave concern. For the foregoing reasons, the court denies both motions for revocation of commitment.
 C. MOTION TO DISMISS
Connecticut Practice Book (Rev. 1998) § 15-8 permits the court to dismiss. a case "whenever it determines that, after the plaintiff has produced his evidence and rested his cause, the plaintiff has presented insufficient evidence to establish a prima facie case against the defendant." Season-All Industries, Inc. v. R. J. Grosso,Inc., 213 Conn. 486, 493, 569 A.2d 32 (1980). In considering and ruling on a motion to dismiss, the court must determine whether "sufficient evidence has been submitted to raise an issue to go to the trier of fact." New England Savings Bank v. Bedford Realty Corp.,246 Conn. 594, 608, 712 A.2d 713 (1998). "The evidence must be such CT Page 5119 that, if credited, it would be sufficient to establish the fact or facts it is introduced to prove." Berchtold v. Maggi, 191 Conn. 266,270, 464 A.2d 1 (1983). In evaluating the motion, the plaintiffs evidence "is to be taken as true and interpreted in the light most favorable to [the plaintiff], and every reasonable inference is to be drawn in [the plaintiffs] favor." Angelo Tomasso, Inc. v. ArmorConstruction and Paving Inc., 187 Conn. 544, 548, 447 A.2d 406
(1982). "A plaintiff has failed to make out a prima facie case "when the evidence produced by the plaintiff, if fully believed, would not permit the trier in reason to find the essential issues on the complaint in favor of the plaintiff." Rosenfield v. Cymbala,43 Conn. App. 83, 91, 681 A.2d 999 (1996), citing Minicozzi v.Atlantic Refining Co., 143 Conn. 226, 230, 120 A.2d 924 (1956).
The respondents claim that the petitioner has failed to establish aprima facie case on all grounds alleged. Viewing the evidence in the light most favorable to the petitioner, the court does conclude that the petitioner failed to establish even a prima facie case as to abandonment of these children by either Linda S. or Raymond B. Accordingly, that ground is dismissed as to these two parents. The court denies the motions as to the other grounds and concludes that the Petitioner established a prima facie case as to no on-going parent-child relationship and the parents' failure to rehabilitate. Further, the petitioner has also proven a prima facie case on all grounds against William R., and the court therefore denies the motion as to him.
 D. ADJUDICATORY FINDINGS 1. Preliminary Issues: Reasonable Reunification Efforts
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts. . . ." Connecticut General Statutes § 17a-112 (c)(1). The statute does not define the term "reasonable." The Connecticut Court has held that "reasonable" is a term which varies according to its context and is synonymous with equitable, fair, and just, citing Webster's New International Dictionary (2nd Ed.). State v. Antrim, 185 Conn. 118, 122,440 A.2d 839 (1981) (citations omitted). More recently, in the termination of parental rights context, the Appellate Court stated that reasonable efforts means doing everything reasonable, not everything possible." In re Savanna M., 55 Conn. App. 807, 812-813
___ A.2d ___ (1999) (citations omitted); In re Jessica B., CT Page 512050 Conn. App. 554, 566, 718 A.2d 997 (1998).
The court concludes, from the clear and convincing evidence, that DCF took reasonable reunification steps in this case. Those steps, detailed earlier in this decision, continued for a long period of time. The first DCF worker assigned to the case was of the opinion that a termination of parental rights case should have been commenced in 1997. Nonetheless, Linda and Ray were given another opportunity and yet another opportunity in the spring of 1999 to demonstrate that they could parent these children. William R., Jr., the father of the two oldest children, never offered himself as a resource for these children and the court concludes the services offered in his case as well were reasonable, under all the circumstances.
In this case, DCF has also alleged that the parents were unwilling and unable to benefit from reunification efforts. The court concludes, from the clear and convincing evidence, that neither Linda S. nor Ray B. benefited from the services offered to them in any demonstrable degree, except for Linda's current abstinence from illegal substances. Ray B. still has made no progress to be able to parent his son. William R. was also unable to benefit from services.
 2. Adjudicatory Findings
(a) Linda S.
On October 24, 1996, all three children were adjudicated homeless and committed to the care and custody of DCF for a period of twelve months. Their commitment has been extended since that time. The court further finds, by clear and convincing evidence, that as of June 1, 1999, Linda S. had not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of her children, she could assume a responsible position in their lives. Connecticut General Statutes §17a-112 (c)(3)(B). "Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M.,6 Conn. App. 194, 203, 504 A.2d 532 (1986), see also; In re JuvenileAppeal, 1 Conn. App. 463, 477, 473 A.2d 795 (1984). The court concludes Linda's lack of rehabilitation is demonstrated by the very long time that she took to begin the first rehabilitative steps in dealing with her substance abuse. DCF worked with her with extensive services after the children were removed. Only in the past year has she responded positively to those services. Linda's recovery from her addiction has consumed a significant period of time in her children's lives. There is no certainty about the stability of her recovery. CT Page 5121 Further, the psychological expert testified that at least two more years of sobriety will now be required before it could be concluded that she could safely parent these children.
The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child, " and to consider if such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 167, 554 A.2d 722
(1989), In re Hector L., 53 Conn. App. 359, 366-367, ___ A.2d ___ (1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petitions, the court must consider not only Linda S.'s conduct prior to the filing of those petitions, but also her conduct after that time. In this case, this was a period of time less than one year, during which time Linda S. has made commendable progress on her own issues of substance abuse.
The difficulty lies not with the progress she has made, but with the length of time that is still required. Linda's children have been in foster care for more than three years. Soon it will be four years. Children of their ages require permanency. Our courts have noted the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal (84-CD), 189 Conn. 276,455 A.2d 1313 (1983). In addition, "because of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V. 25 Conn. App. 741, 748,596 A.2d 930 (1992). The court concludes from the clear and convincing evidence that expecting these children to wait an additional two years in foster care for the rehabilitation of their mother before a return to her care could reasonably be considered is simply too long, given their needs. The court therefore concludes, from the clear and convincing evidence, that Linda has failed to rehabilitate within the meaning of the statute.
The second ground for termination of Linda's parental rights is her failure to have an ongoing parent-child relationship with her children. To succeed on this ground, DCF must show the absence of "the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and [that] to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(D); In re Savanna M.,55 Conn. App. 807, 815, 740 A.2d 484 (1999). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed CT Page 5122 between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced."In re Juvenile Appeal (Anonymous), 181 Conn. 638, 645, 436 A.2d 290
(1980) (internal citation omitted). The decisive question is "whether the child has no present memories or feelings for the natural parent." Id. At 646. As the Appellate Court recently noted, "the feelings of the child are of paramount importance." In re Tabitha T.,51 Conn. App. 595, 602, 722 A.2d 1232 (1999). "Feelings for the natural parent connotes feelings of a positive nature only." Id.
In the case of Linda, the psychologist detailed as to Daniel and Ray that each had an anxious attachment" to their mother and Ray Jr. to his father. He stated that such an attachment was not healthy and that he did not observe the emotional closeness between the children and Linda and Ray as he would have expected. He did note that Billy seemed to be content to be in his mother's presence. The court cannot conclude from this that the petitioner has met the burden of showing that an ongoing parent-child relationship does not exist by clear and convincing evidence. There is some relationship, it is not a healthy one, but it still exists and therefore the court dismisses Ground D as to Linda S.
(b) Raymond B.
Raymond B. has also failed to rehabilitate himself as a parent as of June 1, 1999. The court finds from the clear and convincing evidence that he has failed to deal with his ability to parent his child in a meaningful way. While he has complied with most of the expectations set for him, visited regularly with his child and attended programs, the personal change and growth that these steps and services are intended to bring about is not evident. As noted by the Boys Village workers and the social worker, he cannot set limits for his son and cannot control him. While Ray, Jr. clearly enjoys the visits he has with his father, it is more like a visit between friendly acquaintances than anything else. Nonetheless, as noted by Dr. Rosado, Ray B. and his son share an anxious attachment with ambivalent feelings on the child's part and it is not a healthy relationship.
How long would it be before Ray B. could parent his son? This remains an unanswered question. However, the court concludes that no progress was made towards this goal in 1999 and there is no evidence that it would be any time soon. The court has previously found that Ray sees his role as derivative of Linda's and does not himself perceive the need for improvement in this area. The court concludes that Ray's rehabilitation within a reasonable time in the future, given the age CT Page 5123 and needs of his son, is a wishful chimera. The court finds, from the clear and convincing evidence, that he has failed to rehabilitate within a reasonable period of time within the meaning of the statutory criteria.
As to the lack of an ongoing parent-child relationship, the court concludes that the petitioner did not meet its burden by clear and convincing evidence on this ground. Ray, Jr. enjoys visiting with his father and they have some relationship remaining. The court therefore dismisses Ground D of the termination petition as to Raymond B.
(c) William R.
The petition alleges that William R. has abandoned his children. "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare."In re Juvenile Appeal (Docket No. 9489), 183 Conn. 11, 14,438 A.2d 801 (1981). While William R. has visited with his children, more regularly since the commencement of termination petitions, all the other indicia required by the statute are not present. He simply was never involved in the lives of these children. He does not inquire about their well being, he has not sent cards, letters or gifts and demonstrates no concern for their welfare. The court finds that this ground has been proven by clear and convincing evidence.
The termination petition also alleges that there is no ongoing parent-child relationship between William R. and his two sons and to allow further time for the development of such a relationship would be detrimental to the best interests of the children. The court finds, by clear and convincing evidence, that as of June 1, 1999, William R. had no such relationship with either Billy or Daniel R. While Billy's feelings about anyone, given his autistic state, are hard to determine, the court does conclude, by the clear and convincing evidence, that his biological father has never met the day-to-day physical, emotional or educational needs of this child. The same conclusion is obvious for his younger son, Daniel. Daniel does not speak of either his mother or his father. William R. has not attempted to put himself in a position where he could care for his sons in all of the years that the children have been in foster care. The court further concludes that there is no likelihood that he will do so in the foreseeable future, given his actions in the past four years. The court has noted these children's needs for permanency. The court finds that permanency in their living situation is in their best interests. Because of these important needs, permitting William R. more time to establish himself in their lives is detrimental to CT Page 5124 them, and the court so concludes, from the clear and convincing evidence.
The court also finds, from the clear and convincing evidence, that William R. has not rehabilitated himself so that he could parent his two children. As previously found, he does not offer himself as a resource with whom the children could live, but only as a visiting resource. He has made no progress in the years since the removal of the children to indicate that he could care for his sons at any time in the near future. It would be detrimental to these children to wait any longer for permanency which their biological father does not offer them. It is for these reasons, that the court finds, based on the clear and convincing evidence that William R. has failed to rehabilitate himself so that he could parent either of these children.
 E. REQUIRED STATUTORY FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (e):
(1) Appropriate and timely services were provided by DCF to the family. These included services to benefit the children and referrals for Linda to deal with issues of parenting, and substance abuse. Services were offered to Raymond B. as well, which included parenting and counseling as well as substance abuse referrals. As noted, with regard to William R., a referral for housing was provided. DCF also provided visitation for all parents and case management services.
2) As previously noted, the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family. The court also finds that all parents were unable to benefit from the reunification efforts.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable court expectations were set for Linda and Raymond D. Linda was not able to fulfill them and while Ray met many of his, no demonstrable change in his behavior has taken place. None were set for William R., as he never came forward to seek to parent his children.
4) The feelings and emotional ties of the children with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the children for at least one year and with whom the children have developed significant emotional ties. Billy is, as far as can be determined, very connected to his foster mother, with whom he has lived for more than three CT Page 5125 years. He has done well with her help and the help of his special school. He remains significantly impaired and is a low-functioning autistic child. Daniel R. has lived with his foster father for over three years as well and is attached to him. He, also has done well in this placement with his sibling, Ray. While Daniel knows his biological mother and father, the court concludes that the relationship he has with them is not as nurturing or sustaining as the one he has with his foster father. Ray, Jr., as previously found, has also done well and is close to his foster father. His relationship with his father is a manipulative one and not beneficial to him. He is not attached to either his mother or father in a positive way.
5) Finding regarding the ages of the children: Billy is sixteen years old, Daniel is nine and Ray, Jr. is turned seven this past January.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return him to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the child as part of an effort to reunite the child with them, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. As detailed above, the court finds that none of the parents has made any changes in their lives to accommodate the care and nurturing of these children.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the children by the unreasonable act or conduct of the other parent of the children or the unreasonable act of any other person or by the economic circumstances of the parent. No such conduct is noted. DCF has taken many steps for many years to encourage Linda to have a meaningful relationship with her children and to rehabilitate herself, which she has been unable to accomplish. The court makes the same finding as to the biological fathers of these three children.
 F. DISPOSITION
Even after finding that the statutory grounds for the entry of a judgment of termination of parental rights have been met by the clear and convincing evidence, the court must make a broad inquiry as to whether or not termination is in a particular child's best interest. Such a determination of necessity invites an expansive inquiry, reviewing not only the seven statutory factors set forth in Connecticut General Statutes § 17a-112, but also the broad concept of CT Page 5126 the best interest of the child.
 "Conducting a best interests analysis is not a narrow concept restricted to a compelling reason or to fully reuniting one parent with the child. Rather it is purposefully broad to enable the trial court to exercise its discretion based on a host of considerations." In re Alissa N., 56 Conn. App. 203, 209, ___ A.2d ___ (1999).
Since Billy's situation is different than that of Daniel or Ray, the court will consider these children in turn, reviewing first the circumstances of Billy, Linda's autistic oldest child.
 1. Best interests of William R., III, known as "Billy".
Billy is now sixteen years of age. He is in a foster home where the foster parents do not plan to adopt him. Nonetheless, he is connected to them and this home and has done well there. This court has noted in another context:
 "[t]here are circumstances where parents, through various acts, have lost their connection to their children and new connections are in the process of being established by their children with others. For these children, permanency is necessary and a continued, even limited connection to their biological parents can and does disrupt such permanency." In re Alissa N., 56 Conn. App. 203, 210, ___ A.2d ___ (1999).
Nevertheless, in Alissa N., the child's circumstances were such that her permanency was not disrupted by continued contact with her biological mother as she was significantly handicapped in her ability to understand and be torn by such conflicting familial ties. The court concludes that Billy's circumstances are similar. Were his rights to his parents terminated, there is no one to adopt him, although there are individuals willing to provide him with the very significant care he requires. Granting the termination petition will not increase the permanency he has achieved in the home of his loving foster mother, nor would such permanency be negatively impacted by denial of the termination petition. Even in the unlikely event that an adoptive home could be located for him, the court concludes that moving him into another home, given his age and the severity of his handicaps, would not be in his best interests. The court therefore concludes that termination of parental rights of Linda S. and William R. would serve no purpose.
Permitting Linda S. and William R. continued limited access to CT Page 5127 Billy may well be in his long term best interests. Their contact with him in the future, should he be placed in a group home when he reaches twenty-one, also might be beneficial to him. The court cannot see how, given those charged with providing and caring for him, such contact could be harmful. Dr. Rosado noted, while observing a group interaction session that the family largely ignored Bill. Nonetheless, if there were one-on-one visitation between Billy and his biological parents in a quiet setting appropriate to an autistic child, such contact could well be beneficial and would give Billy more individuals who can be involved in his life for the future. For the foregoing reasons, the court concludes there is not clear and convincing evidence that it is in Billy's best interests to terminate the rights of his biological parents to him. The court dismisses the petition as to Linda S. and William R. in its entirety, based on the consideration of Billy's best interests.
The court further orders that Billy remain committed to the custody of the Commissioner of the Department of Children and Families. The court further directs that DCF share with the foster mother the recommendations of Dr. Rosado regarding the application which must, in his opinion, now be filed for Billy for care after age twenty-one. The court will leave it to the discretion of DOF to determine at the present time what level of visitation with his biological parents is in his best interests, but does order that some contact be permitted. The court does find, despite the dismissal of the termination, that further efforts for reunification between Billy and his biological parents, except for limited visitation as set forth above, are not in his best interests and need not be made.
 2. Daniel and Ray, Jr.
Daniel and Ray fortunately have had a more normal life course than their oldest brother. They do not suffer from Billy's disabilities, they are younger and are with a foster father who is prepared to adopt them. Counsel for the children found the foster father's refusal to consider direct contact of the children with their parents after termination and after adoption problematic. It was one of the reasons he maintained that termination was not in the best interests of the children. But as noted in Alissa N. supra, there are times when continued contact between the biological parents and the children would interfere with the new connections they must form and will continue to have this effect on them. The court does not disagree with Dr. Rosado that the children may require counseling to deal with the up-coming transitions in their lives. Indeed, the evaluation recommends that Daniel receive counseling now to deal with his present situation. The court directs that such counseling be CT Page 5128 facilitated for him and the counselor be provided a copy of Dr. Rosado's most recent assessment of this child. Further, both Daniel and Ray, Jr. may well require some input from their biological parents in the future during the process of ending their relationship with their biological parents and answering questions about their own identity. But, the court does not conclude from this testimony that direct contact between these children and their biological parents is desirable. Further, it is appropriate for a prospective foster parent to state his views forthrightly and honestly. If the foster father becomes the adoptive parent, he would have the legal right to determine with whom the children associate. His refusal to permit contact with the biological parents and the two children after adoption is consistent with the legal rights he would then possess. He testified that if the therapist recommended contact between the children and their biological parents, he would take this step in the context of therapy, demonstrating that he has the best interests of the children at heart.
The court concludes, from the clear and convincing testimony, that it is in the best interests of Daniel and Ray to permit the permanency an adoptive home would offer. No home is perfect in all respects, but both children have done well in the over three years they had resided with their present foster father. This home and their foster father demonstrably has provided them with the stability and nurturing which they require.
The court therefore orders that the parental rights of Linda S. to Daniel S. and Raymond B., Jr. be terminated. It further orders the parental rights of William R.. Jr. to Daniel S. be terminated and that the rights of Raymond B. to Raymond B., Jr. be terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent of these two boys. Given that the foster father has expressed a desire to adopt both Daniel and Ray, the court directs that he be given first consideration in any adoption. The court further orders that permanency plans for Daniel and Ray be submitted within sixty days. Review plans for the children shall be filed in accordance with state and federal law.
Barbara M. Quinn, Presiding Judge Child Protection Session
[2] Respondent Mother's Exhibit K, DCF Investigations Summary, page 4.
[3] The treatment social worker, Cheryl Paul, wrote in the social study that "the children were adjudicated neglected". She was criticized by the respondents for not properly setting forth what happened, that they were "homeless. The court, however, views the CT Page 5129 term "neglected" as that generic term commonly used by workers to describe this stage of the proceedings and nothing more.
[4] Exhibits 1, 11, 12(a)-(f) detail those efforts at Guenster and ABH
[5] Exhibit 5, Linda S.'s certified criminal record.
[6] Even William, despite his autism, clearly recognizes and responds to Linda.
[7] Exhibit 14, Psychological Evaluation of Linda S. on 12/3/98, 12/15/98, page 6.
[8] Exhibit 14, pages 6 and 7.
[9] Respondent mother's Exhibits B, D, and S (1).
[10] Exhibit 13, evaluation of Raymond B. on 12/3/98, page 6.
[11] Exhibit 15, page 2 and 3.
[12] Exhibit 19, page 13.
[13] Exhibit 16, Diagnostic Assessment of William R. ending 1/12/2000.
[14] Exhibit 19, Family Evaluation, January, 2000.
[15] While these was some testimony and questioning about what the children may have said about their desire to go home to their biological parents, the motion to have the children testify to the court was denied. Counsel for the children, on the basis of Dr. Rosado's recommendations and the children's statements to their foster father, recommended that they not be permitted to testify about their preferences.